1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  JESSE ORLANDO BARELA,              Case No.:  19cv1929 CAB (AGS)

12                          Petitioner,

                                      **ORDER DENYING PETITION**
13  v.                                **FOR WRIT OF HABEAS**
                                      **CORPUS and DENYING**
14  MARION SPEARMAN, Warden,          **CERTIFICATE OF**
                                      **APPEALABILITY**
15                          Respondent.

16

17  **I.  INTRODUCTION**

18          Petitioner Jesse Orlando Barela is a state prisoner proceeding pro se proceeding

19  with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition" or

20  "Pet."). Barela challenges his conviction for attempted murder, corporal injury to a

21  spouse, and child abuse in San Diego Superior Court case no. SCN352354. The Court

22  has read and considered the Petition, [ECF No. 1], the Answer and Memorandum of

23  Points and Authorities in Support of the Answer [ECF No. 6, 6-1], the lodgments and

24  other documents filed in this case, and the legal arguments presented by both parties. For

25  the reasons discussed below, the Court **DENIES** the Petition and **DISMISSES** the case

26  with prejudice. The Court **DENIES** a Certificate of Appealability.

27  / / /

28  / / /

## II. FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The state appellate recounted the facts as follows:

> Barela and Jennifer were married in January 2013. At the time of their marriage, Jennifer had a 12-year-old daughter, Tatyanna P., from a prior relationship. Throughout the entirety of their marriage Barela suffered from bipolar disorder and posttraumatic stress disorder (PTSD). He was controlling and abusive toward Jennifer, both verbally and physically.

> In April 2013, Jennifer called the police after Barela physically abused and threatened her. Jennifer told the responding officer that Barela had been physically abusing her almost daily, that he threatened to kill her if she called the police, and that he regularly told her the only way she would leave him is if she was dead. Barela was arrested and convicted of domestic violence.

> Barela and Jennifer stayed together, and Barela's controlling and abusive behavior continued. Jennifer described herself as a "prisoner" in her home because Barela would forbid Jennifer from leaving the apartment without him. He repeatedly threatened her, saying he would "end" her, and that if she tried to leave him she would "be in the ground." In addition, Barela and Jennifer frequently argued about Tatyanna.

> On November 7, 2015, Barela and Jennifer argued about Tatyanna, who was then 14 years old. That afternoon Barela sent Jennifer text messages about Tatyanna stating, "Yeah, well, I'm tired of her doing whatever she wishes and getting away with it. Not in my fucking house . . . ." That day Tatyanna had sneaked out to attend a football game. When she came home, Barela and Jennifer were arguing, and they continued arguing throughout the evening. Around 9:30 p.m., Barela began sending text messages to his mother complaining about Tatyanna's behavior and the way Jennifer disciplined her daughter. Around 9:45 p.m., Jennifer and Tatyanna were lying on the living rooms couch watching television. Barela yelled at them because he thought Jennifer should have more strictly

punished Tatyanna for sneaking out, and that as part of the punishment Tatyanna should not be allowed to watch television. Barela went to the kitchen and returned with a knife. He used the knife to cut the television cord so that no one could watch television. He grabbed the couch that Jennifer and Tatyanna were lying on and lifted it up, so they both "jumped" off the couch and went into Tatyanna's bedroom to disengage from the argument. Throughout the argument Barela continued sending text messages to his mother saying, "It all just got out of hand, Ma, all the damn time." His mother replied that he should "[t]ry to set some boundaries, baby." To which Barela responded at 10:01 p.m., "There are no boundaries, Ma. I'm done. I've lost all control."

Minutes after Jennifer and Tatyanna went to Tatyanna's bedroom, Barela came into the bedroom. He continued to yell about Jennifer's failure to properly discipline Tatyanna, telling her she was a horrible mother. Jennifer and Tatyanna yelled back and him, and he punched a hole in the wall outside of the bedroom and aid, "[F]uck this." Barela grabbed an eight-inch knife from the kitchen, returned to Tatyanna's bedroom, and began stabbing Jennifer, aiming for her head. As he stabbed her Jennifer curled up in the corner of the bedroom and covered her head with her hands. Barela stabbed Jennifer in the head, upper neck, chest, left arm and other areas of her body. Jennifer yelled for Tatyanna to run.

Tatyanna ran out of the apartment and Barela chased her with the knife. She ran a considerable distance around the apartment building to her grandparents' apartment, which was located on the opposite side of the same apartment building. [footnote omitted.] Barela chased Tatyanna with the knife the entire way as she screamed for help. As she got closer to her grandparents' front door, she screamed for her grandmother and pounded on the front door. Barela caught up to Tatyanna and started stabbing her. When her grandparents opened the door, Tatyanna was on the ground and Barela was stabbing her in the back. Eventually, Tatyanna's grandmother and neighbors were able to pull Barela away from Tatyanna. He stabbed deep into her chest, causing her lung to collapse, as well as her cheek, back, and deep into her arm.

After a 911 call, the police and paramedics were dispatched to the apartment complex at approximately 10:04 p.m. Jennifer, who was bleeding profusely, had gone outside and was screaming for help. A neighbor, who was a registered nurse, tended to Jennifer until the paramedics arrived. Another neighbor, who was a Navy medic, tended to Tatyanna. Tatyanna

1  was struggling to breathe and bleeding heavily.  While being restrained,
2  Barela yelled at the Navy medic to stop providing aid to Tatyanna and to
   "get away" from her.

3

4         Both Jennifer and Tatyanna were transported to local hospitals.
   Jennifer's injuries required surgery.  She was placed in the intensive care
5  unit and remained in the hospital for four or five days.  As a result of her
   injuries, Jennifer had lasting damage to her left hand, nerve damage to the
6  left side of her face, as well as short term memory loss.  Tatyanna suffered
7  potentially life-threatening injuries requiring surgery and was in the hospital
   for about a week.  Tatyanna did not return to school until about a month
8  after the incident.  Tatyanna had scars on her back, wrist, forearm, face, and
9  head and her wrist continues to cause her pain.

10  (Lodgment No. 6, ECF No. 7-19 at 2-6.)

11  **III.  PROCEDURAL BACKGROUND**

12        On June 29, 3017, the San Diego District Attorney's Office filed an Information

13  charging Jesse Orlando Barela, Jr. with two counts of attempted murder (counts one and

14  two), a violation of California Penal Code §§ 187(a) and 664, one count of corporal

15  injury to a spouse (count three), a violation of California Penal Code § 273.5(a) and one

16  count of child abuse (count four), a violation of California Penal Code § 273a(a).

17  (Lodgment No. 1 vol. 1, ECF No. 7-1 at 38-41).  As to counts one and two, the

18  information alleged the attempted murder was willful, premeditated and deliberate,

19  within the meaning of California Penal Code § 189.  (*Id.* at 39-40.)  As to counts one and

20  three, the Information alleged that Barela personally inflicted great bodily injury under

21  circumstances involving domestic violence, within the meaning of California Penal code

22  § 12022.7(e).  (*Id.*)  The Information also alleged that, as to all four counts in the

23  Information, Barela personally used a deadly weapon in the commission of the crime,

24  within the meaning of California Penal Code § 12022(b)(1).  (*Id.* at 38-41.)  Counts two

25  and four alleged Barela personally inflicted great bodily injury during the commission of

26  those crimes, within the meaning of California Penal Code § 12022.7(a).  (*Id.* at 39-40.)

27  Finally, as to count three, the Information alleged Barela committed the crime within

28  / / /

4

seven years of a prior domestic violence conviction, within the meaning of California Penal Code § 273.5(f)(2). (*Id.* at 40.)

Following a jury trial. Barela was convicted of all counts and the jury found all the allegations to be true. (Lodgment No. 1 vol. 2, ECF No. 7-5 at 40-48.) Barela was sentenced to two consecutive terms of life with the possibility of parole plus nine years. (Lodgment No. 1 vol. 2, ECF No. 7-3 at 78-81.)

Barela appealed his conviction to the California Court of Appeal for the Fourth Appellate District. (Lodgment Nos. 3-5, ECF Nos. 7-16–7-18) The state appellate court upheld his conviction in a written opinion. (Lodgment No. 6, ECF No. 7-19.) Barela then filed a petition for review in the California Supreme Court. (Lodgment No. 7, ECF No. 7-20.) The state supreme court summarily denied the petition. (Lodgment No. 8, ECF No. 7-21.)

Barela filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court on October 3, 2019. (Pet., ECF No. 1.) Respondent filed an Answer and Memorandum in Support of the Answer on November 15, 2019. (Answer, ECF Nos.6, 6-1.) Barela did not file a Traverse.

## IV. ANALYSIS

Barela raises three grounds for relief in his Petition. In ground one he claims he was wrongfully convicted in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the prosecutor and the state court did not properly take into account his Post Traumatic Stress Disorder (PTSD), resulting in him being "overcharged." (Pet., ECF No. 1 at 6.) In ground two, he contends there was insufficient evidence presented to support his convictions. (*Id.* at 7.) And in ground three he argues that because he suffers from PTSD and bipolar disorder his convictions and sentence violate the 8th Amendment. (*Id.* at 8.) As to grounds one and three, Respondent argues the claims are unexhausted but plainly meritless. (Answer, ECF No. 6-1 at 5-6, 8-9.) Respondent contends the state court's resolution of Barela's second

1 ground for relief was neither contrary to, nor an unreasonable application of, clearly

2 established Supreme Court law. (*Id.* at 6-8.)

3     A. <u>Legal Standard</u>

4     This Petition is governed by the provisions of the Antiterrorism and Effective

5 Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997).

6 Under AEDPA, a habeas petition will not be granted with respect to any claim

7 adjudicated on the merits by the state court unless that adjudication: (1) resulted in a

8 decision that was contrary to, or involved an unreasonable application of clearly

9 established federal law; or (2) resulted in a decision that was based on an unreasonable

10 determination of the facts in light of the evidence presented at the state court proceeding.

11 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's

12 habeas petition, a federal court is not called upon to decide whether it agrees with the

13 state court's determination; rather, the court applies an extraordinarily deferential review,

14 inquiring only whether the state court's decision was objectively unreasonable. See

15 *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th

16 Cir. 2004).

17     A federal habeas court may grant relief under the "contrary to" clause if the state

18 court applied a rule different from the governing law set forth in Supreme Court cases, or

19 if it decided a case differently than the Supreme Court on a set of materially

20 indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant

21 relief under the "unreasonable application" clause if the state court correctly identified

22 the governing legal principle from Supreme Court decisions but unreasonably applied

23 those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable

24 application" clause requires that the state court decision be more than incorrect or

25 erroneous; to warrant habeas relief, the state court's application of clearly established

26 federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75

27 (2003). The Court may also grant relief if the state court's decision was based on an

28 unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

## B. Failure to Sufficiently Consider Barela's PTSD (ground one)

In Barela's first ground for relief he states that he "suffers from PTSD and bipolar disorder" and claims he was wrongfully convicted because "the court did not make a sufficient determination of [his] mental status which led [to me] being overcharged . . . ." (Pet., ECF No. 1 at 6.) Respondent argues this claim is unexhausted and, in any event, meritless because "Barela fails to identify a constitutional right allegedly violated by the purported failure to consider his medical diagnoses in a specific way." (Answer, ECF No. 6-1 at 5-6.)

Although Barela invokes the Sixth, Eighth and Fourteenth Amendments in ground one, as Respondent notes it is not entirely clear what Barela's claim is or whether it is a separate claim from ground two. In any event, the claims are unexhausted because Barela did not present them to the California Supreme Court either on direct appeal or on state habeas corpus review. (Lodgment Nos. 3-8, ECF Nos. 7-16–7-21.) A federal court may deny a petition with unexhausted claims, however, if it is "perfectly clear that the applicant does not raise even a colorable federal claim." *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).

///

19cv1929 CAB (AGS)

The Sixth Amendment guarantees a defendant the right to a speedy and public trial, an impartial jury, to be informed of the charges, to confront the witnesses, to be represented by counsel and to present a defense.  U.S. Const., amend. VI.  Barela does not allege he was denied any of these rights, and the record reflects he was afforded the rights to which he was entitled under the Sixth Amendment.  Barela's assertion that "the court did not make a sufficient determination of [his] mental status which led [to me] being overcharged . . ." could be interpreted to be a claim that he was denied an opportunity to present a defense, but counsel presented evidence of Barela's PTSD and bipolar disorder to the jury at trial.  (Lodgment No. 2 vol. 6, ECF No. 7-11 at 106-93.)  The Eighth Amendment proscribes cruel and unusual punishments.  U.S. Const., amend. VIII.  Barela has raised an Eighth Amendment challenge to his sentence in ground three and the Court addresses that claim in section IV(D) of this order.  The Fourteenth Amendment guarantees a defendant a fair trial.  U.S. Const., amend. XIV.  Barela's statement that "the court did not make a sufficient determination of my mental status which led [to me] being overcharged . . ." could be interpreted to be claim that he was denied a fair trial because of his mental illness.  But Barela presented his mental defense to the jury at trial and the judge at sentencing.  (Lodgment No. 2 vol. 6, ECF No. 7-11 at 106-93.)  Both the jury and the trial judge considered his mental issues in making their decisions.  (Lodgment No. 1 vol. 1, ECF No. 7-3 at 31-55 [statement in mitigation and probation report]; Lodgment No. 2 vol. 9, ECF No. 9-14 [transcript of sentencing].)  That they did not come to the conclusions Barela wanted them to does not establish his right to a fair trial was violated.  Accordingly, Barela is not entitled to relief as to ground one. *Cassett*, 406 F.3d at 624.

C.  Sufficiency of Evidence (ground two)

Barela contends in ground two that insufficient evidence was presented to support the premeditation and deliberation elements of his convictions for murder.  (Pet., ECF No. 1 at 7.)  Respondent argues the state court's denial of this claim was neither contrary

to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer, ECF No. 6-1 at 6-8.)

Barela raised this claim in his petition for review he filed in the California Supreme Court on direct review, which summarily denied the petition.  (Lodgment No. 7, ECF 7-20.)  Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis.  That court wrote:

> The crime of attempted murder requires proof of the specific intent to kill coupled with the commission of a direct but ineffectual act toward accomplishing the intended killing.  (*People v. Smith* (2005) 37 Cal.4th 733, 739.)  For purposes of sentence enhancement, a jury may find that an attempted murder was willful, deliberate, and premeditated.  (Pen. Code, § 664, sudb. (a).)  "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.  [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]"  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*).)
>
> In *Anderson*, our Supreme Court identified three basic categories of evidence pertinent to the determination of premeditation and deliberation in the context of murder:  (1) facts prior to the killing that may be characterized as planning activity; (2) facts about the defendant and victim's relationship that support a motive for the killing; and (3) facts about the manner of killing, which support an inference that it was done according to a preconceived design.  (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)  The identified categories of evidence are those we "'typically' find sufficient" to uphold first degree murder convictions.  (*People v. Thomas* (1992) 2 Cal.4th 489, 517.)  But our Supreme Court has also observed that the *Anderson* factors are simply an "aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse."  (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 (*Perez*); accord, *People v. Streeter* (2012) 54 Cal.4th 205, 242.)
>
> Here, the record contains all three of the *Anderson* types of evidence to support a finding of premeditation and deliberation for both counts 1 and 2.

///

///

As to count 1, the jury could reasonably find Barela planned to kill Jennifer.  Planning activity does not have to be extensive to support a finding of premeditation; it can occur in a short period of time.  (*People v. Brady* (2010) 50 Cal.4th 547, 563-564.)  Retrieving a weapon before a killing suggests planning.  (*Perez*, *supra*, 2 Cal.4th at p. 1126 [obtaining a knife from the kitchen showed planning].)  Here, Barela's actions support planning and premeditation.  Barela followed Jennifer into the bedroom without a knife, but then left the bedroom in frustration and went to the kitchen to retrieve a large knife.  Barela returned to the bedroom and used the knife to stab Jennifer repeatedly.  Barela asserts his actions after picking up the knife are inconsistent with planning.  He asserts the evidence shows he charged into the room, raised the knife, and started stabbing his wife, which is inconsistent with planning.  We reject this assertion.  Going to the kitchen to get a larger knife and taking it back to the bedroom definitively shows planning.  (*Sanchez*, at pp. 34-35.)  Barela's argument draws inferences from the evidence to support his contention this was a frenzied attack.  While an expert testified that Barela suffered from both bipolar disorder and PTSD at the time of the assaults, which could lead to his being impulsive and behaving irrationally, the jury did not draw the inferences he urges, and we may not do so on appeal.

The jury could also reasonably find that Barela had motive to kill Jennifer.  A history of violence and threats of violence may constitute proof of a motive to commit the offense.  (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 893 ["evidence showing 'quarrels, antagonism or enmity between an accused and the victim of a violent offense is proof of motive to commit'" murder, citations omitted].)  The evidence showed that Barela was a controlling and abusive husband throughout their entire marriage and that Barela made prior threats to kill Jennifer, saying he would "end [her]," "put a bullet in [her] head," and put her "in the ground."  The evidence of violence and threats throughout their marriage is motive evidence suggestive of premeditation.

In *People v. Jackson* (1989) 49 Cal.3d 1170, the Supreme Court held that anger at the victim, even when irrational, supplies a motive to support a finding of premeditation and deliberation.  (*Id.* at p. 1200 [unprovoked anger at police officer established motive].)  On the day of the stabbing, Barela was frustrated that he could not convince Jennifer to more strictly discipline Tatyanna after she had sneaked out to attend a football game.  Just three minutes before the 911 dispatch, Barela texted his mother that no boundaries were being set and he had "lost all control."  The evidence of Barela's

10

continued frustration on the day of the stabbing suggest an additional motive that supported the jury's inference he acted with premeditation in stabbing her.

Lastly, the jury could reasonably find that Barela was deliberate in his manner of attacking Jennifer. The location of her stab wounds supported the conclusion he was targeting vital areas such as her head and neck, "intimating a preconceived design to kill." (*People v. Elliot* (2005) 37 Cal.4th 453, 471 [repeated knife wounds as method of killing suggesting premeditation]; *Koontz, supra*, 27 Cal.4th at p. 1082 [aiming at vital area at close range supports finding of premeditation and deliberation].)

As to count 2, the jury could have also reasonably found Barela planned to kill Tatyanna. In *People v. Memro* (1995) 11 Cal.4th 786, 863, our Supreme Court recognized a reasonable jury could conclude that during the time it took the defendant to run 178 feet between victims, the defendant considered his options. (*Ibid*.) Similarly, here, a reasonably jury could conclude Barela's actions were considered and premeditated when he chased Tatyanna with a knife for about 300 yards before stabbing her.

The jury could also reasonably find that Barela had motive to kill Tatyana. Frustration over inability to control a child's behavior can be a preexisting motive indicating premeditated murder. (See *People v. Jennings* (2010) 50 Cal.4th 616, 646 [evidence of a preexisting motive existed when defendant had a history of using physical violence to discipline the child].) Here, the evidence showed Barela and Jennifer would frequently fight about the way Jennifer disciplined Tatyanna, and Barela's text messages that day show he was particularly angry and frustrated over Tatyanna's act of attending a football game without permission. Additionally, Barela's actions on the night of the stabbing, the cutting of the television cord, and the lifting of the couch, illustrate his frustration with Tatyanna's behavior. This evidence of frustration regarding Tatyanna's behavior established a motive that supported the inference he premeditated his attempt to kill her. (*Jennings*, at p. 646.)

Finally, the evidence shows Barela was deliberate in his manner of attacking Tatyanna. After chasing Tatyanna considerable distance, Barela stabbed her and only stopped stabbing her when the knife was pulled loose from his hands and he was physically restrained. While restrained, he yelled at a Navy medic tending to Tatyanna, telling the medic to get away from her.

19cv1929 CAB (AGS)

1    (*Koontz*, *supra*, 27 Cal.4th at p. 1082 [preventing medical care showed
2    deliberation].)

3         While the evidence may have supported a contrary finding, it is not
4    our role to reweigh the evidence where the circumstances reasonably justify
     the trier of fact's findings.  (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)
5    Based on the record before us, we conclude there was substantial evidence to
6    support the jury's finding of willfulness, premeditation, and deliberation for
     both counts 1 and 2.
7

8    (Lodgment No. 6, ECF No. 7-9 at 7-11.)

9         The Due Process Clause of the Constitution guarantees defendants the right to be

10   convicted only upon proof of every element of a crime beyond a reasonable doubt.  *Juan*

11   *H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (citing *In re Winship*, 397 U.S. 358, 364

12   (1970)).  On federal habeas corpus review of a conviction on sufficiency of evidence

13   grounds, however, a petitioner "faces a heavy burden" to establish a due process

14   violation.  *Id*.  In assessing a sufficiency of the evidence claim, a state court must apply

15   the standard announced by the Supreme Court in *Jackson v. Virginia*, "whether, after

16   viewing the evidence in the light most favorable to the prosecution, any rational trier of

17   fact could have found the essential elements of the crime beyond a reasonable doubt."

18   *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  While

19   circumstantial evidence can be sufficient to support a conviction, "[s]peculation and

20   conjecture cannot take the place of reasonable inferences and evidence . . . ."  *Juan H.*,

21   408 F.3d at 1279; *see also Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217-18 (9th Cir. 2018);

22   *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 2000) ("mere suspicion or

23   speculation cannot be the basis for logical inferences").  Moreover, under AEDPA "the

24   standards of *Jackson* are applied 'with an additional layer of deference,' requiring the

25   federal court to determine 'whether the decision of the [state court] reflected an

26   "unreasonable application of" *Jackson* . . . to the facts of this case.'"  *Maquiz*, 907 F.3d at

27   1217 (internal citations omitted).  A federal habeas court must "mindful of 'the deference

28   owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional

sufficiency review.'" *Juan H.*, 408 F.3d at 1274 (quoting *Wright v. West*, 505 U.S. 277, 296-97 (1992) ).  Deference under AEDPA, however, "does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  In determining whether sufficient evidence has been presented, the Court refers to the elements of the crime as defined by state law.  *See Jackson*, 443 U.S. at 324, n. 16; *Juan H.*, 408 F.3d at 1276.

Barela specifically challenges the sufficiency of evidence to support the premeditation and deliberation element of his attempted murder convictions.  (Pet., ECF No. 1 at 7.)  California courts have described premeditation and deliberation as follows:

> "In the context of first degree murder, '"premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action."'" (*People v. Lee* (2011) 51 Cal.4th 620, 636, 122 Cal.Rptr.3d 117, 248 P.3d 651 (Lee).)  The required mind state "is uniquely subjective and personal.  It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." (*People v. Chiu* (2014) 59 Cal.4th 155, 166, 172 Cal.Rptr.3d 438, 325 P.3d 972.)  "[T]he reflection necessary to establish premeditation and deliberation is not measured by duration of time: 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides . . . which are the result of mere unconsidered or rash impulse hastily executed.'" (*People v. Wright* (1985) 39 Cal.3d 576, 593, 217 Cal.Rptr. 212, 703 P.2d 1106.)

*People v. Wear*, 44 Cal.App.5th 1007, 1020-21 (2020).

In *People v. Anderson*, 70 Cal.2d 15, 26-27 (1968), the California Supreme Court "developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation." *People v. Halvorsen*, 42 Cal.4th 379, 419-20 (2007).  The *Anderson* court "described three categories of evidence recurring in those cases: planning, motive, and manner of killing." *Id.*, citing *People v. Perez*, 2 Cal.4th 1117, 1125 (1992) and *Anderson*, 70 Cal.2d at 27.  "Regarding these categories,

13

*Anderson* stated: "Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with either [planning] or [manner of killing]." *Perez*, 2 Cal.4th at 1125, citing *Anderson*, 70 Cal.2d at 27. The *Anderson* guidelines, however, "are descriptive and neither normative nor exhaustive, and . . . reviewing courts need not accord them any particular weight. *Halvorsen*, 42 Cal.4th at 420.

On the night of the crimes, Barela was very upset with Jennifer because he believed she did not discipline her daughter Tatyanna sufficiently for sneaking out of the house to attend a football game. (Lodgment No. 2 vol 4, ECF No. 7-9 at 41.) The subject of Jennifer's disciplining of Tatyanna was an ongoing issue between Jennifer and Barela. (*Id.* at 54.) Barela and Jennifer argued for most of the evening because Barela thought Jennifer should have punished Tatyanna more severely by telling her she had to stay in her room and taking away Tatyanna's television privileges. (*Id.* at 42.) Tatyanna and Jennifer were lying on the couch watching television while Barela and Jennifer were arguing, which angered Barela. (*Id.* at 44-45.) Barela picked the couch up while Jennifer and Tatyanna were lying on it and flung it into the air, causing them to jump off of it. (*Id.* at 45-46; Lodgment No. 2 vol. 5, ECF No. 7-10 at 23.) Barela then went to the kitchen and came back with a knife and cut the television cord with it. (Lodgment No. 2 vol. 4, ECF No. 7-9 at 49-50; Lodgment No. 2 vol. 5, ECF No. 7-10 at 23.) Jennifer took Tatyanna to Tatyanna's bedroom to get away from Barela, but Barela followed them to the bedroom, tried to pull Tatyanna's door off the hinges and when he could not do so, punched the wall outside Tatyanna's bedroom. (Lodgment No. 2 vol. 4, ECF No. 7-9 at 50, 56-57.) He then left the room and returned with a different, bigger knife and began stabbing Jennifer. (*Id.* at 57-58.) When Jennifer screamed at Tatyanna that Barela was killing her and to run, Barela chased Tatyanna a significant distance then stabbed her. (*Id.* at 63-64; Lodgment No. 2 vol. 5 at 32-33.) A reasonable juror could conclude from Barela's violent and escalating behavior that he had a motive – anger and frustration at

1   Jennifer's failure to discipline Tatyanna, Tatyanna's misbehavior and a desire to stop it –

2   to kill Jennifer and Tatyanna.

3          Evidence that Barela had been physically abusive the entire length of their

4   marriage, from 2013-2015 also helped establish motive.  (Lodgment No. 2 vol. 4, ECF

5   No. 7-9 at 28-33.)  As the state court noted, under California law prior acts of violence

6   and threats against a victim can support a jury's conclusion that the defendant had a

7   motive to kill the victim.  *See People v. Kovacich*, (2011) 201 Cal.App.4th 863, 893

8   (stating that "evidence showing 'quarrels, antagonism or enmity between an accused and

9   the victim of a violent offense is proof of motive to commit the offense'"); *see also*

10  *People v. Johnson*, 185 Cal.App.4th 520, 524-25 (2010).  In addition, Barela made

11  statements in the past that could be reasonably interpreted to be threats to kill Jennifer.

12  During a domestic violence incident in 2013, Barela told her that if she called police he

13  would "get to her" before the police got there.  (Lodgment No. 2 vol. 4, ECF No. 7-9 at

14  33.)  He also told her he would "end" her, and that the only way she would leave him is if

15  she was "laid to rest."  (*Id.* at 33-34; Lodgment No. 2 vol. 6, ECF No. 7-11 at 24.)  The

16  verbal abuse and threats was a "day-to-day part of [the] marriage."  (Lodgment No. 2 vol.

17  4 at 37.)

18         There was also sufficient evidence from which a reasonable juror could conclude

19  Barela planned the attack.  Both Jennifer and Tatyanna testified Barela did not have a

20  knife in his hands when he punched the wall outside Tatyanna's bedroom.  (Lodgment

21  No. 2 vol. 5, ECF No. 7-10 at 21.)  After punching the wall, however, he left and returned

22  with a "much bigger" knife and stabbed Jennifer and Tatyanna.  (*Id.* at 29.)  This

23  evidence supports a conclusion by the jury that after punching the wall, Barela decided to

24  go to the kitchen to retrieve a bigger knife because he planned to stab Jennifer and

25  Tatyanna.  *See People v. Perez*, 2 Cal.4th 1117, 1164 (1992) (finding that a defendant's

26  act of entering a house and obtaining a knife from the kitchen was indicative of planning

27  activity).  "Under California law premeditation and deliberation can occur in a brief

28  / / /

period of time." *People v. Brady*, 50 Cal.4th 547, 564 (2010), citing *Halvorsen*, 42 Cal.4th at 419.

Finally, there was sufficient evidence for the jury to conclude premeditation and deliberation from the manner of Barela's attack. Barela chose a large knife and focused his attack on the most vulnerable areas of his victims' bodies. Jennifer's wounds were on her head, face and arm. (Lodgment No. 2 vol. 4, ECF No. 7-9 at 63.) One of Jennifer's neighbors who came to Jennifer's aid, a navy medic named Jaclyn Place, testified Jennifer was bleeding profusely from the wounds on her head and arm, that the wound on her arm had hit an artery and that Jennifer was in danger of bleeding to death. (Lodgment No. 2 vol. 5 at 151.) Tatyanna testified she heard Jennifer say "He's killing me" as Barela began to stab Jennifer and that Barela was "aiming for [Jennifer's] head. (*Id.* at 29, 31.) Barela only stopped his attack on Jennifer when she told Tatyanna to run. When Tatyanna ran from the bedroom, Barela chased her a significant distance and when he caught up with her he stabbed her in the face, arms and back. (*Id.* at 40-42.) Barela only stopped stabbing Tatyanna when her grandmother wrapped her arm around Barela's neck from behind and grabbed the hand Barela was using to stab Tatyanna. (*Id.* at 93.) Tatyanna's grandfather and two neighbors had to restrain Barela because he was "kicking and flailing" and telling Place to get away from Tatyanna. (*Id.* at 162.) Tatyanna's wounds were also life-threatening. Place testified that after tending to Jennifer she ran to attend to Tatyanna who was losing "copious amounts of blood," was "having a hard time breathing" and was "definitely already turning blue." (*Id.* at 157.) Jaclyn thought Tatyanna was going to die. (*Id.* at 159. The wound in her back punctured Tatyanna's lung and she was in the hospital for a week. (*Id.* at 42-43.)

Viewing the evidence in a light most favorable to the prosecution, as this Court is required to do, the Court concludes that the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law because "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Nor was the state court's denial

19cv1929 CAB (AGS)

1 based on an unreasonable determination of the facts. 28 U.S.C. § 2244(d)(2). Barela is

2 not entitled to relief as to this claim.

3    D. <u>Eighth Amendment (ground three)</u>

4    Barela's final ground for relief is his claim that his sentence violates the Eighth

5 Amendment. As Respondent notes, this claim is unexhausted. (Answer, ECF No. 6-1 at

6 8-9.) As noted above, however, a federal court may deny a petition with unexhausted

7 claims, however, if it is "perfectly clear that the applicant does not raise even a colorable

8 federal claim." *Cassett*, 406 F.3d at 624.

9    "The Cruel and Unusual Punishments Clause prohibits the imposition of inherently

10 barbaric punishments under all circumstances." *Graham v. Florida*, 560 U.S. 48, 59

11 (2010). The *Graham* court noted the scope of the Supreme Court's Eighth Amendment

12 jurisprudence as follows:

13
14    For the most part, however, the Court's precedents consider punishments challenged not as inherently barbaric but as disproportionate to the crime. The concept of proportionality is central to the Eighth Amendment.

15
16    Embodied in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Weems v. United States*, 217 U.S. 349, 367,

17    30 S.Ct. 544, 54 L.Ed. 793 (1910).

18 *Id.*

19    "Outside the context of capital punishment, successful challenges to the

20 proportionality of particular sentences have been exceedingly rare." *Rummel v. Estelle*,

21 445 U.S. 263, 272 (1980). In *Hutto v. Davis*, (1982) 454 U.S. 370, the Supreme Court

22 noted that *Rummel* "stands for the proposition that federal courts should be 'reluctan [t] to

23 review legislatively mandated terms of imprisonment.'" *Hutto*, 454 U.S. at 374, citing

24 *Rummel*, 445 U.S. at 274. In California, the punishment for attempted murder is life with

25 the possibility of parole. *See* Cal. Penal Code §§ 187, 189, 664 (West 2019). Barela was

26 sentenced to life with the possibility of parole for each count of attempted murder for

27 which he was convicted. (Lodgment No. 1 vol. 1, ECF No. 7-3 at 80.) He has made no

28 showing that his sentence was disproportionate to his crimes nor has he presented any

reason for this court to question the "legislatively mandated term of imprisonment" he received. Accordingly, he is not entitled to relief as to this claim. *Cassett*, 406 F.3d at 624.

## V.  CONCLUSION

For the foregoing reasons, the Petition is **DENIED**.  Rule 11 of the Rules Following 28 U.S.C. § 2254 require the District Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. § 2254 (West 2019).  A COA will issue when the petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253 (West 2019); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).  A "substantial showing" requires a demonstration that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'"  *Beaty v. Stewart*, 303 F.3d 975, 984 (9th Cir. 2002) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Here, the Court Concludes Barela has not made the required showing, and therefore a certificate of appealability is **DENIED**.

**IT IS SO ORDERED.**

Dated:  April 8, 2020

_____

Hon. Cathy Ann Bencivengo
United States District Judge